IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STEPHANIE RODRIGUEZ, et al., ) | CIVIL NO. 08-00189 SOM/KSC |
| ) | |
| Plaintiffs, ) | ORDER DENYING PLAINTIFFS' |
| ) | MOTION FOR JUDGMENT AS A |
| vs. ) | MATTER OF LAW AND FOR A NEW |
| ) | TRIAL |
| GENERAL DYNAMICS ARMAMENT AND ) | |
| TECHNICAL PRODUCTS, INC., et ) | |
| al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

ORDER DENYING PLAINTIFFS' MOTION
FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL

I.      INTRODUCTION.

        On March 10, 2006, amid the first round of afternoon

firing during a military mortar training exercise at Pohakuloa

Training Area on the Big Island of Hawaii, a mortar shell

prematurely exploded in its gun.  The mortar shrapnel injured

Army soldiers Julius Riggins, Samuel Oyola-Perez, and Wilfredo

Dayandante, and killed Oscar Rodriguez.  The soldiers and their

families sued General Dynamics Armament and Technical Products,

Inc. ("General Dynamics"), alleging that the mortar shell

produced by General Dynamics' predecessor in 1982 was defective.

See Trial Transcript, Nov. 23, 2010 ("11/23/10 Tr."), 36:10-40:19

(Plaintiffs' closing argument); see also Trial Transcript, Nov.

23, 2010 ("11/23/10 Tr."), 17:16-171:13 (jury instructions), ECF

No. 763.

        The trial in this strict liability case spanned six

weeks. Relying on the doctrine of <u>res ipsa loquitur</u>, Plaintiffs introduced testimony of eyewitnesses that the soldiers were operating the mortar cannons (or "guns") properly during the training exercises, and that nothing out of the ordinary occurred before the explosion. <u>See</u> 11/23/10 Tr. 41:16-60:24 (closing argument), 172:2-19 (jury instructions). Plaintiffs also offered the opinion of an expert, John Nixon, that the shell was defective when it was manufactured. <u>See generally</u> Trial Transcript, Nov. 3, 2010 ("11/3/10 Tr."), 127:4-148:14, ECF No. 716.

General Dynamics' theory of the case was that, during the morning training exercises that day, a shell misfired, <u>i.e.</u>, failed to exit the gun and then detonate. <u>See, e.g.</u>, 11/23/10 Tr. 82:3-21, 97:5-110:3 (closing argument). General Dynamics argued that the soldiers--not realizing that an unexploded shell was still in the gun--loaded a second shell on top of the existing shell (a "double load"), causing the shells to explode in the gun. <u>See</u> <u>id.</u>

After deliberating for two and a half days, the jury returned a special verdict indicating that the shell was not defective, and the court entered judgment in favor of General Dynamics. <u>See</u> Minutes, Nov. 30, 2010, ECF No. 775; Special Verdict Form, ECF No. 776; Judgment, ECF No. 783.

Plaintiffs now renew their motion for judgment as a

matter of law or, in the alternative, seek a new trial.

Plaintiffs argue that testimony by Philip Leong, the person who

investigated the cause of the mortar explosion in this case for

the United States Army, was improperly admitted.  Plaintiffs also

argue that the court erred in responding to a jury question about

the effect of a determination by the jury that there was not

enough evidence to establish a defect in the mortar shell.  The

court responded that the jury had to return a verdict of "no

defect" in that event.  Because the court concludes there was no

error in the admission of Leong's testimony or in the court's

response to the jury, the court denies Plaintiffs' motion.

II.      RELEVANT FACTUAL BACKGROUND.

        The parties are familiar with the background facts of

this case, so the court will not recite them here except as

necessary to decide the present motion.

        A.    Pretrial Motions Regarding Testimony of Philip
              Leong.

        Philip Leong investigated the mortar explosion at issue

on behalf of the Army's Armament Research Development and

Engineering Center ("ARDEC") shortly after the accident occurred

in 2006.  See 11/12/10 Tr. 73:6-22, 75:14-24.  Responding to a

request from General Dynamics, the Army initially authorized

Leong to be deposed regarding factual information concerning the

investigation.  See Ltr. from K. Robitaille to T. Schaefer, Apr.

23, 2009, ECF No. 465-6.  In April 2010, the Army additionally

authorized Leong to provide factual and lay opinion testimony at
trial pursuant to Rule 701 of the Federal Rules of Evidence.  See
Ltr. from S. Morris to T. Schaefer, Apr. 7, 2009 [sic 2010], ECF
No. 736-3; Trial Transcript, Nov. 16, 2010 ("11/16/10 Tr."),
65:9-17, 121:10-124:20, 130:1-17.

On April 12, 2010, General Dynamics asked the court to
declare Leong a neutral expert, pursuant to Rules 614 and 706 of
the Federal Rules of Evidence.  See Motion For Court to Order
Leong to Testify as to His Opinions & Conclusions Under Fed. R.
Evid. 614 or 706 ("Def.'s 4/12/10 Leong Mot."), ECF No. 465; cf.
Fed. R. Evid. 614 ("The court may, on its own motion or at the
suggestion of a party, call witnesses . . . ."), 706 (authorizing
the court to appoint experts).  In response, Plaintiffs sought to
exclude any opinion testimony that might be offered by Leong,
arguing that General Dynamics had previously represented that
Leong would be limited to being a fact witness and that any
opinions he might offer would necessarily fall under Rule 702,
not Rule 701.  See Pls.' Mot. In Limine No. 9 – Non-Designated
Expert Testimony, Fed. R. Civ. P. 26 & Fed. R. Evid. 701, Apr.
27, 2010 ("Pls.' 4/27/10 Leong Mot."), ECF No. 502, see also
Pls.' Mem. Opp. General Dynamics' Motion for Court to Order Leong
to Testify as to His Opinions & Conclusions Under Fed. R. Evid.
614 or 706, ECF No. 479.  The court denied both motions on
October 14, 2010.  See Minutes, Oct. 14, 2010, ECF No. 675.

4

B.     Testimony of Soldier Witnesses.

Several current and former soldiers who were present at Pohakuloa Training Area on the day of the accident testified at trial on behalf of Plaintiffs.  They testified uniformly that no misfire or double loading occurred during the platoon's morning mission.  See, e.g., Trial Transcript, Oct. 20, 2010 ("10/20/10 Tr."), 73:13-18 (Mathew Munch), ECF No. 689; Trial Transcript, Oct. 21, 2010 ("10/21/10 Tr."), 43:5-44:1 (Jason Finkenkeller), 127:7-11 (Kristopher Cutright), ECF No. 691; Trial Transcript, Oct. 22, 2010 ("10/22/10 Tr."), 22:22-23:6, 85:22-24, 95:23-24 (Palmer Baldwin), 131:20-132:2, 134:13-135:7 (Eduardo Alvizo), ECF No. 693.  In addition, several soldier witnesses testified that the mortar cannon should have been, and was, swabbed after the platoon's morning mission.  See, e.g., 10/20/10 Tr. 76:13-78:5 (Munch); 10/21/10 Tr. 46:18-47:18 (Finkenkeller), 107:23-109:22 (Cutright); 10/22/10 Tr. 21:9-13 (Baldwin).  However, only one of the witnesses identified a specific person who had swabbed the gun.  10/21/10 Tr. 46:18-47:18 (Finkenkeller).  The other witnesses, pressed on cross-examination, could not recall who had swabbed the gun.  See, e.g., 10/20/10 Tr. 169:20-25 (Munch); 10/21/10 Tr. 134:24-135:14 (Cutright); 10/22/10 Tr. 21:9-13, 79:2-6 (Baldwin); Trial Transcript, Nov. 9, 2010 ("11/9/10 Tr."), 53:15-54:17 (Oyola-Perez), ECF No. 726; Trial Transcript, Nov. 10, 2010 ("11/10/10 Tr."), 27:11-17 (Riggins), ECF No. 741.

Mathew Munch, the platoon commander, testified that the platoon was short-handed by eleven men on the day of the explosion.  <u>See</u> 10/20/10 Tr. 54:9-17, 148:20-150:5.  Munch also admitted that the platoon did not follow certain standard operating procedures during the training exercises, although he stated that the deviations were minor.  <u>See, e.g.</u>, 10/20/10 Tr. 161:4-163:21.

      C.   <u>Testimony of John Nixon.</u>

     In support of their theory that the shell was defective, Plaintiffs offered the testimony of John Nixon.  <u>See generally</u> Trial Transcript, Nov. 3, 2010 ("11/3/10 Tr."), 71-216, ECF No. 716; Trial Transcript, Nov. 4, 2010 ("11/4/10 Tr."), 3-82, ECF No. 720.  Nixon was Plaintiffs' only expert on causation.  Generally, he testified that he conducted a failure analysis with respect to the explosion, and he opined that the explosion was likely caused by a defective shell.  <u>See</u> 11/3/10 Tr. 107-48.  On cross-examination, however, Nixon acknowledged that, as the mortar shell was destroyed in the accident, he had no direct physical evidence of a defect.  11/4/10 Tr. 24:7-18, 62:21-25.  Nixon also acknowledged that none of the nearly 13,000 other cartridges in the lot reported defects, 11/4/10 Tr. 16:5-20:17, 64:15-18; that each shell had been visually inspected twice for metal cracks or other defects, 11/4/10 Tr. 65:7-18; and that the Army's x-ray inspection technique, used to test the remaining shells for defects, was "quite good," 11/4/10 Tr. 19:13-18,

6

79:13-14.

     D.   Testimony of Philip Leong.

General Dynamics called Leong as its sole witness. Leong testified that he arrived at the site of the accident five days after the March 10, 2006, explosion to gather evidence. See 11/12/10 Tr. 84:4-24, 91:20-92:2, 95:19-23. He testified as to what he observed at the scene of the accident and authenticated photos he had taken at the scene. See, e.g., 11/12/10 Tr. 88:25-89:25, 91:3-92:14, 114:21-115:3. He testified regarding his efforts to locate where the four guns had been situated at the time of the explosion, his efforts to look for additional evidence such as explosive residue and weapon and ammunition fragments, and his recovery of pieces of the shell downrange from the explosion. 11/12/10 Tr. 96:17-100:24, 116:4-125:17, 130:16-133:25, 135:3-138:17; 11/16/10 Tr. 185:13-186:19. He said that he had visually inspected the remaining ammunition. 11/12/10 Tr. 145:15-147:22. According to Leong, the accident scene contained less evidence than he had encountered in any other in-bore detonation investigation. 11/12/10 Tr. 137:23-138:1.[1]

Leong testified that the gun he found was damaged in the upper midsection of the tube. See, e.g., 11/12/10 Tr. 93:23-94:4; 11/16/10 Tr. 93:1-5. Leong also testified that, in his

---

[1]This testimony, although now objected to by Plaintiffs in their Supplemental Memorandum, ECF No. 813, was not the subject of specific objection at trial.

7

experience, an explosion in the top of a gun is associated with either a double-loaded gun or an obstruction in the gun. 11/16/10 Tr. 173:15-174:20. Leong described the condition of the gun tube when he found it and pointed out rusty conditions present in the tube displayed before the jury. 11/12/10 Tr. 140:11-17, 143:20-144:2, 171:5-172:5. Leong was not permitted to testify as to what he concluded from the rust he pointed to on the weapon. 11/12/10 Tr. 143:22-23, 171:23-174:5.

Leong brought with him the actual mortar tube for gun number 2, the gun that exploded. 11/12/10 Tr. 103:17-105:2. Plaintiffs objected that Leong had not shown them the mortar tube before trial and that General Dynamics had not listed the mortar tube on its exhibit list. However, based on Plaintiffs' representation that they had never asked for the mortar tube from the Army, the court overruled the objections and admitted the mortar tube into evidence. 11/12/10 Tr. 107:4-108:16, 109:15-16. Plaintiffs later represented that their deposition subpoena was broad enough to include the mortar tube, but they did not request any further action from the court with respect to the mortar tube. See 11/16/10 Tr. 14:9-21, 17:8-15, 24:15-25:2.

Leong also testified that he found a notebook with the effects of one of the soldiers, but testified that it was smaller than a notebook that had been identified as belonging to Plaintiff Oyola-Perez. 11/16/10 Tr. 33:13-38:1. Leong was not

permitted to testify regarding the contents of the notebook.  <u>See</u> <u>id.</u>

Leong testified that he sent the remaining ammunition that had been scheduled to be fired on March 10, 2006, to Yuma Proving Ground in Arizona for further inspection.  11/12/10 Tr. 148:6-149:14.  Leong testified--without objection--that he reviewed acceptance records for this lot of ammunition and found no problem with the lot.  11/12/10 Tr. 149:15-150:11.  Leong testified that he looked at records for "sister lots" (lots accepted by the Army before and after the current lot) of ammunition, and found no recorded problems.  11/12/10 Tr. 150:12-153:6.  Plaintiffs did not object to this testimony on the ground that Leong lacked personal knowledge or on any other Rule 701 ground.

Leong testified that he had the remaining shells x-rayed at Yuma Proving Ground.  He inspected the images and found no cracks, cavitation, or foreign bodies in the remaining ammunition.  11/12/10 Tr. 153:7-163:8.  Plaintiffs did not object to this testimony.  11/12/10 Tr. 159:6-8.  Leong testified that the remaining shells were then physically inspected and fired at Yuma Proving Ground.  11/12/10 Tr. 163:9-167:16.

According to Leong, the firing pin of the gun involved in the accident was loose.  11/12/10 Tr. 167:17-169:17.  He testified that a loose firing pin can cause a misfire.  11/16/10

Tr. 209:20-211:1. Leong also testified that the fin of the mortar shell he recovered bore two indents, as if a round had hit the firing pin twice. Trial Transcript, Nov. 17, 2010 ("11/17/10 Tr."), 160:12-161:14, ECF No. 744. Leong further testified that he found the fuse cap and that it had been flattened out and partially damaged. 11/16/10 Tr. 178:5-183:9; 11/17/10 Tr. 157:4-160:11.

Leong testified that his practice was to try to determine the cause of an explosion by considering possible problems with the gun tube, firing pin, mortar cartridge, fuse, high explosives in the mortar cartridge, and human error or double loading. 11/16/10 Tr. 74:25-77:9. Leong described a test he performed to eliminate the fuse as the cause of the explosion. 11/16/10 Tr. 192:3-195:15. Leong described, without objection, a test he had run at Benet Laboratory, an outside laboratory, that determined that the gun tube itself was not cracked. 11/16/10 Tr. 195:21-196:6. Leong also described a double loading test he ran at Yuma Proving Ground with the same type of ammunition; he stated that no in-bore detonation occurred during the test. 11/17/10 Tr. 98:4-102:3, 154:23-156:3.

Leong explained that his experiences in other investigations led him to take the actions he took in this investigation. Leong testified that he had been involved in investigating other 81 mm mortar explosions, and discussed his

10

experience identifying "signatures" of malfunctions such as a defective shell versus a double load. See 11/16/10 Tr. 39:15-47:9, 68:5-71:18, 78:3-5, 188:14-20, 201:15-202:14; 11/17/10 Tr. 154:23-156:9.

In particular, Leong testified that he had previously investigated two premature in-bore explosions--one in a 4.2 mortar system, and one in 1990 on an 81-millimeter M252 mortar system, which is the type of weapon involved in the Pohakuloa incident. 11/16/10 Tr. 38:21-25, 71:13-22, 78:3-80:16. Leong testified that, in a 1990 test, he drilled holes in a cartridge to simulate a serious defect in a mortar shell. 11/16/10 Tr. 85:6-92:15. In that case, the cartridge exploded while in the lower section of the gun tube. See id. Leong also testified that, in 1990, he used a system that had been developed by the Army to simulate double loading. 11/16/10 Tr. 95:21-96:10, 107:22-109:5. Plaintiffs lodged objections to testimony regarding this simulated double loading test, and Leong did not ultimately testify as to the results of his test. See 11/16/10 Tr. 107:22-113:12.

Leong testified that, to determine whether an explosion was caused by a defect or double loading, he typically examined the residue around the gun and considered where in the gun tube the explosion had occurred. See, e.g., 11/16/10 Tr. 206:12-16. Relying on, inter alia, the tests he ran, the fuse he found, and

the location of the damage to the gun, Leong concluded that the most probable cause of the explosion was double loading.  <u>See</u> 11/16/10 Tr. 207:7-209:5.[2]  Leong testified that in most of his investigations the most likely cause was human error.  11/16/10 Tr. 218:19-21.

        E.   <u>Note From the Jury #3.</u>

On the first full day of jury deliberations the jury submitted three questions to the court.  <u>See</u> ECF Nos. 765-70. Note From the Jury #3 concerned the language of the first question on the special verdict form, which read: "Was the 81mm mortar shell defective?"  <u>See</u> ECF No. 776.

---

[2]On the issue of causation, Plaintiffs objected that Leong's testimony that double loading caused the explosion differed from the report Leong prepared and from Leong's deposition testimony. <u>See</u> 11/16/10 Tr. 115:15-118:22, 133:7-138:3, 140:11-25.  General Dynamics argued that Leong's testimony on this issue was consistent with his deposition and that he was entitled to give testimony that varied from his report because the report was not prepared for the case and because Leong was testifying as a fact witness.  <u>See</u> <u>id.</u>  The court requested that the Army's attorney, Samuel Morris, explain whether the Army was going to permit Leong to give opinions not contained in Leong's report, and Morris said that Leong was permitted to give such testimony because the opinions presented by Leong "would naturally flow from the documents that have already been presented to the Court." 11/16/10 Tr. 118:23-124:20.  Ultimately, the court allowed Leong to present opinions not contained in his report, but restricted Leong's opinion testimony to the contents of his deposition.  <u>See</u> 11/16/10 Tr. 145:5-6, 157:25-158:24.  The court also permitted Plaintiffs to introduce a report Plaintiff Stephanie Rodriguez received from the Army suggesting that a defect (not double loading) caused the accident.  11/16/10 Tr. 158:5-16; 11/23/10 Tr. 23:6-23.

The jury asked, "Your Honor, We would like to know, regarding question #1, if a ruling of 'Not enough evidence to prove a defective shell' would equate to a responce [sic] of 'No,' respectively." ECF No. 769. After consulting with the parties, the court responded as follows:

> If, after considering all the evidence and the court's instructions, including the instructions on pages 9, 10, 17, 18, 20, 21, 22, 23, 24, 25, and 26, you determine that there is not enough evidence to prove a defective shell, then your answer to Question No. 1 should be "No."

Response to Jury Note #3, ECF No. 770. On page 25, the jury instructions advised: "In determining whether or not the 81 MM mortar shell was defective, you are instructed that the plaintiffs need not prove a specific defect." Jury Instr. 25, ECF No. 764. Pages 25 through 26 constituted the court's instruction on the doctrine of res ipsa loquitur. See Jury Instr. 25-26.

Plaintiffs objected to the court's response, arguing that the court should not have listed particular jury instructions in its response and that the response did not adequately address the "evidentiary presumption." Transcript of Proceedings, Nov. 24, 2010 ("11/24/10 Tr."), 4:9-5:7, ECF No. 798. Plaintiffs did not request that any other jury instructions be referenced in the court's response. See id.

III.      <u>PROCEDURAL HISTORY.</u>

Plaintiffs filed their initial Motion for Judgment as a Matter of Law and for New Trial on December 27, 2010. ECF No. 787. The argument portion of the motion for new trial, which largely concerned the testimony of Philip Leong, lacked citations to the complained-of portions of Leong's testimony and Leong's deposition. <u>See</u> Mem. Supp. Pls.' Mot. for JML & New Trial ("Mot.") 15-23, ECF No. 787-1. The memorandum also violated Local Rule 7.5(f), which requires a table of contents and table of authorities for a memorandum longer than 15 pages. General Dynamics opposed Plaintiffs' motion, ECF No. 801 ("Opp."), and Plaintiffs replied on March 11, 2011, ECF No. 805 ("Reply"). Meanwhile, on March 10, 2011, the court ordered Plaintiffs to refile their motion with appropriate, specific citations to the record, along with a table of contents and a table of authorities. <u>See</u> ECF No. 803. Plaintiffs submitted a corrected memorandum on March 14, 2010. Corr. Mem. Supp. Pls.' Mot. for JML & New Trial ("Corr. Mot.") 1-2, ECF No. 809.

At the hearing on this matter, the court expressed continued confusion regarding Plaintiffs' citations to the trial transcript, which appeared to be based on partial trial transcripts that did not match the pagination of the complete official transcripts posted on the docket. General Dynamics expressed similar confusion. The hearing was largely devoted to

explanation by Plaintiffs regarding the parts of the record to
which they objected.  The parties agreed that Plaintiffs would
submit a supplemental brief with citations to the official
transcripts in support of the points they had raised, and
Plaintiffs did so on April 11, 2011.  <u>See</u> ECF Nos. 812-13.  On
April 25, 2011, General Dynamics again opposed the motion, ECF
No. 814, and the court took the matter under advisement.

IV.     <u>STANDARD.</u>

    A.   Rule 50(b) (Renewed/Alternative Motion For a New
        <u>Trial Filed After Trial).</u>

If a party makes a motion for judgment as a matter of
law that is not granted by the court, that party may file a
renewed motion pursuant to Rule 50(b) of the Federal Rules of
Civil Procedure after entry of judgment.  Rule 50(b) provides
that a court ruling on a renewed motion after a verdict may allow
the judgment to stand, may direct entry of judgment as a matter
of law, or may order a new trial.  The arguments in the renewed
motion are limited to those raised in the initial motion.  <u>See</u>
<u>Freund v. Nycomed Amersham</u>, 347 F.3d 752, 761 (9th Cir. 2003).

The Supreme Court has explained that a Rule 50(b)
motion cannot be granted unless, as a matter of law, the opposing
party failed to make a case and, therefore, a verdict in the
movant's favor should have been directed.  <u>See</u> <u>Montgomery Ward &</u>
<u>Co. v. Duncan</u>, 311 U.S. 243, 251 (1940).  Therefore, the moving
party must show that the evidence, construed in the light most

favorable to the nonmoving party, permitted only one reasonable conclusion, and that conclusion is contrary to jury's verdict. See Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002). If the jury's verdict is supported by evidence adequate to support the jury's conclusion, the verdict must be upheld, even if it is also possible to draw a contrary conclusion from the same evidence. Wallace v. City of San Diego, 479 F.3d 616, 624 (9th Cir. 2007).

In deciding whether judgment as a matter of law is warranted, the court may not assess the credibility of witnesses and must draw all reasonable inferences in the nonmovant's favor. See Bell v. Clackamas County, 341 F.3d 858, 865 (9th Cir. 2003); see also Harvey v. Office of Banks & Real Estate, 377 F.3d 698, 707 (7th Cir. 2004) ("Our job at this stage is not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict." (citation omitted)).

B.   Rule 59(a) (Motion for a New Trial).

Rule 59(a) of the Federal Rules of Civil Procedure provides that a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Rule 59 does not specify the grounds on which a motion for a new trial may be granted. Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1035 (9th Cir. 2003). Rather, the court is "bound by those grounds that have been historically

16

recognized." <u>Id.</u> Historically recognized grounds for a new trial include a verdict that is against the weight of the evidence, damages that are excessive, or a trial that was not fair to the moving party. <u>Molski v. M.J. Cable, Inc.</u>, 481 F.3d 724, 729 (9th Cir. 2007). A new trial may be granted only if, after weighing the evidence as the court saw it, "the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." <u>Id.</u> (quoting <u>Passantino v. Johnson & Johnson Consumer Prods., Inc.</u>, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). If the ground for seeking a new trial is an allegedly erroneous evidentiary ruling, the erroneous ruling must have "substantially prejudiced" the complaining party. <u>Ruvalcaba v. City of L.A.</u>, 64 F.3d 1323, 1328 (9th Cir. 1995).

V.      <u>ANALYSIS.</u>

      A.      <u>Motion for Judgment as a Matter of Law.</u>

Plaintiffs' four-sentence motion for judgment as a matter of law fails to state the applicable legal standard or to cite any legal authority or evidence in the record. Instead, Plaintiffs simply assert that they are entitled to judgment as a matter of law on the issue of General Dynamics' liability because Plaintiffs provided "[t]he only competent, properly submitted evidence regarding the cause of the malfunction" and because the soldier witnesses testified that no user error occurred. Corr.

Mot. 1-2. Plaintiffs' oral motion at trial was similarly brief. See 11/23/10 Tr. 28:10-14 (Court: "Anything further to raise before me now all the evidence is in, everybody's rested?" Plaintiffs' Counsel: "Just move for judgment as a matter of law on our claims and judgment as a matter of law on their defenses."). The court denies Plaintiffs' renewed Rule 50(b) motion.

As the court instructed the jury at trial, Plaintiffs bore the burden of proving that the mortar cartridge was defective. See Jury Instr. 9, 17-18, 20-21. Plaintiffs offered John Nixon as their sole expert on the issue of causation. See generally 11/3/10 Tr. 107-48 (Nixon direct testimony). On cross-examination, General Dynamics obtained concessions from Nixon that supported an inference that the shell was not defective. See, e.g., 11/4/10 Tr. 24:7-18, 62:21-25 (Nixon admits that he had no direct physical evidence of a defect); id. at 16:5-20:17, 64:15-18 (Nixon admits that none of the nearly 13,000 other cartridges in the lot had reported defects); id. at 65:7-18 (Nixon acknowledges that each shell was visually inspected twice for metal cracks or other defects); id. at 19:13-18, 79:13-14 (Nixon acknowledges that the Army's x-ray inspection technique, used to test the remaining shells for defects, was "quite good").

Moreover, although several soldier witnesses testified that no double loading occurred, the soldiers also supplied

testimony that could support the opposite inference.  For example, even though several witnesses testified that the mortar cannon was swabbed after the morning mission (which would have allowed the person swabbing the inside to observe a stuck round, if one was present), when pressed on cross-examination, most could not recall who had swabbed the cannon.  <u>See, e.g.</u>, 10/20/10 Tr. 169:20-25 (Munch); 10/21/10 Tr. 73:16-22 (Finkenkeller), 134:24-135:14 (Cutright); 10/22/10 Tr. 21:9-13, 79:2-6 (Baldwin); 11/9/10 Tr. 53:15-54:17 (Oyola-Perez); 11/10/10 Tr. 27:11-17 (Riggins).  <u>See also</u> 10/20/10 Tr. 54:9-17, 148:20-150:5 (testimony of Mathew Munch that the platoon was short-handed the day of the explosion); 10/20/10 Tr. 161:4-163:21 (admission by Munch that the platoon did not follow certain standard operating procedures during the training exercise).  Finally, it is undisputed that General Dynamics offered evidence, through the testimony of Philip Leong, in support of its theory that the mortar explosion was caused by double loading and not by a defect.  <u>See, e.g.</u>, 11/16/10 Tr. 208:25-209:5.

To grant Plaintiffs' motion, the court would have to assume that the jury believed the positive testimony given by the soldier witnesses and Nixon, and discounted or ignored all of the negative testimony by those witnesses, as well as the testimony by Leong that was favorable to General Dynamics.  The court is not free to make such inferences in Plaintiffs' favor on a Rule

50(b) motion.  Because General Dynamics presented evidence
adequate to support the jury's conclusion, Plaintiffs' motion
must be denied.

> B.  <u>Motion for New Trial.</u>

> 1.  <u>Testimony of Philip Leong.</u>

Plaintiffs raise several objections to the testimony of
Army investigator Philip Leong.  Having reviewed the relevant
portions of the trial transcripts, the court concludes that the
testimony was properly admitted.  The court addresses each of
Plaintiffs' objections in turn.

> a.  <u>Rule 701 of the Federal Rules of
> Evidence.</u>

First, Plaintiffs argue broadly that "Leong's testimony
exceeded the scope of [Federal Rule of Evidence] 701."  <u>See</u> Corr.
Mot. 9.  Plaintiffs protest that "the complexity of the causation
issue is far beyond common experience and requires specialized
knowledge."  <u>Id.</u> at 12.  The court finds this generalized
objection to be unfounded.  Leong testified within the limits of
the Federal Rules of Evidence.

Leong conducted one of the Army's investigations into
the cause of the mortar incident.  He personally visited the site
and interviewed witnesses, collected physical and photographic
evidence, and designed and ran tests in a lab setting.  Leong's
factual testimony describing this investigation was highly

relevant to the issue of causation, and its introduction did not violate the strictures of Rule 701.

To the extent the factual testimony provided by Leong necessarily included opinions or inferences, those were permissible because they were rationally based on Leong's own perceptions and observations, along with knowledge he obtained directly from his prior work experience, as opposed to "scientific, technical, or other specialized knowledge."  <u>See</u> Fed. R. Evid. 701.  Under Rule 701, as amended in 2000, lay witnesses may not offer opinions "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c).  However, in adding subsection (c), the Advisory Committee explained that "[t]he amendment is not intended to affect the 'prototypical example[s] of the type of evidence contemplated by the adoption of Rule 701.'"  Fed. R. Evid. 701, Advisory Committee Notes, 2000 Amendments.

The Advisory Committee Notes provide as an example of permissible lay opinion the testimony of an owner or officer of a business regarding the value or projected profits of the business.  Such testimony, while specialized, is permissible because the witness is testifying based on "the particularized knowledge that the witness has by virtue of his or her position in the business."  <u>Id.</u>  Similarly, a witness may offer lay testimony regarding whether a particular substance is a narcotic,

21

provided the witness lays a foundation of sufficient familiarity
and experience with the substance.  See id.

The Ninth Circuit has permitted a government
informant's lay testimony regarding the general structure of drug
operations, stressing that the witness, who had formerly worked
as a drug courier, had personal knowledge of drug operations to
which he testified.  United States v. Beckman, 298 F.3d 788, 791,
795 (9th Cir. 2002).  Moreover, the witness properly provided
specific evidence, based on his interactions with the defendant,
that the defendant knew he was acting as a drug courier.  Id. at
795.  See also United States v. Munoz-Franco, 487 F.3d 25, 34-35
(1st Cir. 2007) (bank vice-president of commercial lending
properly offered lay opinion testimony as to whether bank's
outside auditors were replaced improperly, whether bank
improperly classified certain loans, and whether certain
construction loans were proper, because his testimony on those
subject areas was based on knowledge of the bank's banking
practices acquired while he worked at the bank); Bank of China,
New York Branch v. NBM LLC, 359 F.3d 171, 181 (2d Cir. 2004)
("The fact that [the witness] has specialized knowledge, or that
he carried out the investigation because of that knowledge, does
not prevent him from testifying pursuant to Rule 701, so long as
the testimony was based on the investigation and reflected his
investigatory findings and conclusions, and was not rooted

exclusively in his expertise . . . ."); <u>United States v.</u>
<u>Crawford</u>, 239 F.3d 1086, 1090-91 (9th Cir. 2001) (holding, under
prior version of Rule 701, that a lay witness could testify,
based on his experience with university policies, how the
university used the term "affiliated organization").

　　　　Leong testified as to his investigation on site and as
to the tests he ran and ordered to be run in the lab.  He stated
that he had concluded, based on his investigation, that the most
probable cause of the explosion was double loading.  <u>See</u> 11/12/10
Tr. 88-100, 103-05, 114-25, 130-33, 135-40, 143-69, 171-72, 209-
11; 11/16/10 Tr. 38-47, 68-71, 74-80, 85-93, 95-96, 107-09, 173-
83, 185-86, 188, 192-96, 201-02, 206-11, 218; 11/17/10 Tr. 98-
102, 154-61.  As already noted in detail in the background
information section of this order, all of this testimony was
drawn directly from Leong's experience in this case and his
personal experience conducting prior investigations.  This
testimony was permissible lay opinion.

　　　　The court was highly cognizant of the fact that Leong,
although testifying as a lay witness, also had the ability to
provide expert testimony.  Both before and during trial, the
parties vigorously disagreed about the permissible scope of
Leong's testimony, repeatedly seeking blanket inclusionary or
exclusionary rulings that the court declined to give.  <u>See, e.g.</u>,
Def.'s 4/12/10 Leong Mot.; Pls.' 4/27/10 Leong Mot.; GDATP's

Bench Brief re Scope of Testimony of F.R.E. 701 Witness Philip
Leong & Admissibility of ARDEC Report, Nov. 15, 2010, ECF No.
736.  At most, the court permitted Plaintiffs to have a running
objection to testimony regarding a malfunction "signature."  <u>See</u>
11/16/10 Tr. 69:19-25.

        The court then drew lines concerning admissibility on a
question-by-question basis.  <u>See</u> 11/16/10 Tr. 6:15-7:10
(explaining necessity of line-drawing).  The court permitted
Leong to testify regarding what he had done during his
investigation, but sustained objections to questions calling for
expert testimony.  <u>See, e.g.</u>, 11/12/10 Tr. 83:11-84:2 ("Now, with
respect to the issue of investigating mortar accidents, as you
sit there today, is there anybody that you know of that's more
qualified to do that than you?"), 118:2-8 ("If the mortar shell
explodes in a tube causing what we see here in the exhibits that
we've marked . . . , does the mortar actually explode?"), 140:21-
141:7 ("Did this weapon look like it had been cleaned within the
last week?").  In other cases, defense counsel rephrased
questions to ask Leong what he had actually observed in his own
job experience, rather than asking questions calling for
generalized statements of Leong's opinion.  <u>See, e.g.</u>, 11/12/10
Tr. 86:7-87:23 (regarding the initial steps of the Army's
investigation upon arriving at the accident site), 102:13-23
(concerning whether a base plate marking could have been blown

away by force of helicopter blades), 120:16-122:2 (regarding whether Leong found it unusual that he found no evidence of certain explosive residue), 134:1-20 (regarding the absence of metal recovered from any projectile body).

Plaintiffs' objection that the jury perceived Leong's testimony as the official position of the Army, Corr. Mot. 25, was raised at trial. The court addressed this concern by permitting Plaintiffs to introduce in rebuttal a report that the Army gave Stephanie Rodriguez, stating that the cause of the explosion that killed her husband was a suspected defect in the mortar cartridge, rather than the double loading Leong testified to. 11/16/10 Tr. 158:5-16; 11/23/10 Tr. 23:6-23. The introduction of the alternative report allowed Plaintiffs to argue, if they wished, that Leong was biased or otherwise incredible because the Army had previously told Stephanie Rodriguez a different story regarding causation. 11/16/10 Tr. 161:5-10, 167:25-168:3. Plaintiffs did in fact make this argument in closing. 11/23/10 Tr. 65:3-5, 69:18-70:2, 155:19-25.

Finally, in their reply memorandum, Plaintiffs object to several additional portions of Leong's testimony, arguing that he testified on several occasions without personal knowledge, in violation of Rule 701. See Reply 2-3. The court disagrees. While Leong was not present on the day of the accident, he was allowed to provide factual testimony based on his observations

and investigation into the incident.  He did not purport to give an opinion regarding "the conditions on March 10, 2006."  Reply 2.  In any event, none of the cited testimony was specifically objected to by Plaintiffs on Rule 701 grounds, and their objections are, therefore, waived.  See 11/12/10 Tr. 149-153 (review of acceptance and testing records for the ammunition and "sister lots"); 11/16/10 Tr. 32:10-19 (estimation of gun 2's location), 195:21-196:6 (review of the Benet Laboratory report results regarding the strength of the tube), 232:13-20 (discussion of servicing records and of whether gun had been recently cleaned), 250:22-254:10 (discussion of number of rounds fired of high explosives and white phosphorus); 11/17/10 Tr. 38:1-40:22 (orientation of the guns); see also 11/12/10 Tr. 89:2-19, 98:5-24, 140:7-20; 11/16/10 Tr. 248:25-250:21 (additional testimony cited in Supplemental Memorandum in Support of Plaintiffs' Motion ("Supplemental Mem."), ECF No. 813, but without corresponding trial objection for lack of personal knowledge).

Additionally, Plaintiffs cannot claim they were prejudiced because of Leong's testimony regarding the gun's condition and servicing record, the number of rounds fired, or the orientation of the guns, because the cited testimony was elicited by Plaintiffs on their own cross-examination.  See

11/16/10 Tr. 232:13-20[3], 250:22-254:10; 11/17/10 Tr. 38:1-40:22. By asking for Leong's statements for Plaintiffs' own purposes on cross, Plaintiffs invited a responsive answer from Leong and cannot now object that he rendered opinions in violation of Rule 701.

In sum, Plaintiffs have not persuaded the court that they suffered unfairness, much less the "miscarriage of justice" required for a new trial based on the objected-to portions of Leong's testimony.

> b.  Allegedly Inconsistent or New Testimony, and New Materials Produced at Trial.

Plaintiffs argue that Leong's testimony was flawed because he testified to matters that were not included in his report or his deposition and because he failed to produce physical evidence at his deposition even though it was requested. Corr. Mot. 16-19 (objecting to Leong's testimony regarding, _inter alia_, causation, his observations regarding two pin marks on the fin of the shell, observations regarding the fuse cap, and his finding a notebook at the scene, as well as the production at trial of the mortar tube).[4]  General Dynamics argues that Leong

---

[3]On his direct testimony, Leong was not permitted to opine regarding how recently the tube had been cleaned.  See 11/12/10 Tr. 171:23-174:5.

[4]Plaintiffs also object to certain "photographs of the fuze cap and fin," which Leong produced for the first time after his trial testimony had begun.  Corr. Mot. 17; Supplemental Mem. 6 (citing 11/16/10 Tr. 9-28).  However, Plaintiffs do not cite to

testified consistently with his deposition in all respects.  Opp.
24-30.  The court is unpersuaded by Plaintiffs.

Following extensive discussion with the parties
regarding the scope and consistency of Leong's testimony at trial
as compared with his deposition, see 11/16/10 Tr. 113-71, the
court limited Leong to the opinions that had been elicited at the
deposition.  See 11/16/10 Tr. 145:5-6 ("I'm probably going to
confine him to his deposition opinions"); id. at 171:3-4 ("I am
letting Mr. Leong testify about opinions stated in his deposition
. . . subject to other evidentiary objections in the ordinary
course."); see also id. at 144:18-20, 148:3-150:7, 157:25-158:3
(limiting testimony).  Leong's *factual* observations, however,
were outside the scope of this ruling.  No purpose would have
been served by denying General Dynamics the ability to question
Leong about what he had himself observed and what he did because
Plaintiffs had had ample opportunity to cover all relevant facts
with Leong in his deposition.  For example, General Dynamics
would not have been prevented from asking Leong if it was muddy
on the day he did his investigation, regardless of whether either
side had elicited this information in deposition.  For this
reason, the court permitted General Dynamics to question Leong

_____

any portion of the transcript in which these photographs were
actually offered into evidence by either party.  Without a
showing that the court improperly admitted, or improperly refused
to admit, the photos, the mere fact of Leong's belated production
of the photos does not show harm to Plaintiffs.

regarding his finding a notebook at the scene of the accident and to elicit a description of the fuse cap and the two pin marks on the fin of the shell that Leong observed. <u>See, e.g.</u>, 11/16/10 Tr. 33:13-38:1 (overruling Plaintiffs' objection to Leong's allegedly new testimony regarding a small notebook he found at the scene, noting that Plaintiffs could address testimony in cross-examination); 11/17/10 Tr. 157:4-159:2 (permitting questioning of Leong regarding his observations of the fuse cap and fin).

Plaintiffs could have asked questions of Leong during his deposition that would have elicited Leong's discovery of a notebook at the scene of the accident. Had Leong omitted such information, Plaintiffs' deposition questioning would have then allowed Plaintiffs to use the deposition testimony to discredit Leong before the jury. When a testifying witness changes his story or testifies inconsistently at trial compared with his deposition, the remedy for the adverse party is to cross-examine the witness on those inconsistencies. <u>See</u> Fed. R. Evid. 801(d)(1)(A) (prior inconsistent statement admissible for its truth if given under oath at a deposition); <u>United States v. Bao</u>, 189 F.3d 860 (9th Cir. 1999) (explaining that a prior inconsistent statement raises the suggestion that, if a witness makes inconsistent statements, his entire testimony may not be credible). The jury may believe that such inconsistencies

reflect on a witness's credibility. However, they are not grounds for exclusion of testimony. This court's restriction of Leong's opinion testimony to the opinions expressed in his deposition did not deprive Plaintiffs of their ability to cross-examine Leong on factual inconsistencies between his trial testimony and his deposition testimony, to the extent such inconsistencies were properly captured in Leong's deposition.

With respect to Leong's failure to produce physical evidence that he then brought to trial, this court found no reason to penalize General Dynamics by excluding such third-party evidence. Leong is not a party to this case or otherwise an agent of any party. He was not under General Dynamics' control as an expert or retained witness. The court endeavored to be fair to both sides in allowing introduction of "new," undoubtedly relevant, physical evidence, namely, the gun itself.

Finally, Leong's trial testimony regarding double loading, while perhaps more strongly worded than his deposition, was not inconsistent with his deposition testimony on this issue. See Mot. Exh. C, Depo. Philip Leong ("Leong Depo.") 64-67, 71-72, 90, ECF No. 787-5. Moreover, the court addressed Plaintiffs' concerns of unfair surprise associated with this testimony by allowing Plaintiffs to introduce a report that the Army gave Stephanie Rodriguez stating that the cause of the explosion was a suspected defect in the mortar cartridge, rather than double

loading, as Leong found.  11/16/10 Tr. 158:5-16; 11/23/10 Tr.

23:6-23.  The court also reminded Plaintiffs that they could

recall Nixon, Plaintiff's expert, in rebuttal.  11/16/10 Tr.

25:3-26:15.  The court even suggested that Nixon could appear by

video on rebuttal if he could not be in Hawaii during that part

of the case.  Plaintiffs are not entitled to a new trial based on

any "new" testimony or physical evidence offered by Leong.

        c.    Testimony Regarding Other Double Loading
            Tests Run by Leong.

Leong provided relatively brief testimony regarding

prior tests he had conducted during his research of premature in-

bore explosions, including testing in 1990 in which he drilled

holes in a cartridge to simulate a mortar shell defect, and also

attempted to simulate a double load.  See 11/16/10 Tr. 85:6-

92:15, 95:21-96:10, 107:22-109:5.  Plaintiffs object that:

(1) the testimony was not in Leong's deposition; (2) it was based

on materials Leong did not produce at his deposition; and (3) the

tests were not substantially similar to the accident in this

case.  Corr. Mot. 18, 20-27.  General Dynamics argues that the

tests demonstrated Leong's experience with previous malfunction

testing, that he did provide deposition testimony on the tests,

and that the "substantial similarity" argument is unfounded

because it is based on inapposite Hawaii state law regarding the

admissibility of evidence of prior accidents.  Opp. 32-33.  The

court agrees.

31

First, it appears Leong did discuss previous testing in which he simulated a double load scenario on a 4.2 inch mortar system.  See Mot. Exh. C, Depo. Philip Leong 66-67, 142, 168-70, 222-23, ECF No. 787-5.  To the extent Leong's testimony deviated or went beyond the testimony he provided at the deposition, again, the remedy for surprise testimony at trial largely lies in cross-examination rather than exclusion.  Plaintiffs could have inquired as to why certain matters were not discussed by Leong during his deposition, assuming Plaintiffs had questioned Leong as to such matters at that time.

Moreover, as discussed above, the court addressed Plaintiffs' concerns of unfair surprise associated with this and other new evidence produced by Leong at trial by limiting Leong's opinion testimony to that which he testified to in his deposition, and permitting Plaintiffs to introduce another Army report that reached an alternative conclusion regarding the cause of the explosion.  See 11/16/10 Tr. 144:18-20, 148:3-150:7, 157:25-158:3; 11/23/10 Tr. 23:6-23.

Finally, Plaintiffs' objection to the evidence as insufficiently similar to the incident is misplaced.  The testimony regarding the prior testing was factual testimony, not lay opinion testimony.  Leong was not asked to, and did not, render an opinion regarding whether the earlier tests were substantially similar to the explosion in this case.  Rather,

testimony regarding the testing was limited to Leong's description of what he had done. See 11/16/10 Tr. 85:6-92:15, 95:21-96:10, 107:22-109:5. The threshold admissibility requirement, therefore, was relevance, and the court ultimately concluded after Plaintiffs' voir dire that the testimony presented was relevant to the jury in explaining why Leong took the steps he took in the course of his investigation of the in-bore detonation at issue in this case. See 11/16/10 Tr. 78:19-81:9, 85:23-87:8. Plaintiffs' Hawaii authority regarding admission of prior accidents is inapposite. In those cases, the court was concerned not simply with relevance but also with causation and prejudice, as the plaintiffs were asking the jury to infer that the same defect had caused both the earlier accidents and the accident at issue. See Am. Broadcasting Cos. v. Kenai Air of Haw., Inc., 67 Haw. 219, 224-29, 686 P.2d 1, 5-7 (Haw. 1984) (holding that, before evidence of previous accidents may be admitted to show that a condition was dangerous, the previous accidents must be shown to be the same or substantially similar to the accident at issue); Warshaw v. Rockresorts, Inc., 57 Haw. 645, 651, 562 P.2d 428, 433 (Haw. 1977) (same). Plaintiffs here were not unfairly prejudiced by the admission of testimony regarding the two prior tests Leong had conducted regarding premature in-bore detonations.

2.   <u>Jury Note No. 3.</u>

Finally, nothing about the court's handling of the third jury note resulted in any unfairness or prejudice to Plaintiffs.  Note From the Jury #3 read, "Your Honor, We would like to know, regarding question #1, if a ruling of 'Not enough evidence to prove a defective shell' would equate to a responce [sic] of 'No,' respectively."  After consulting with the parties, the court responded as follows:

> If, after considering all the evidence and the court's instructions, including the instructions on pages 9, 10, 17, 18, 20, 21, 22, 23, 24, 25, and 26, you determine that there is not enough evidence to prove a defective shell, then your answer to Question No. 1 should be "No."

Response to Jury Note #3.

Plaintiffs objected to the page references but proposed no alternative references during trial.  11/24/10 Tr. 4:11-24. Plaintiffs complain that the court's response ignored the doctrine of <u>res ipsa loquitur</u> and instead incorrectly suggested to the jury that Plaintiffs were required to prove the specific defect that caused the mortar shell to detonate.  Corr. Mot. 25-26; <u>see also</u> 11/24/10 Tr. 4:9-5:7.  The court does not agree. Page 25 of the jury instructions, to which the court's response directed the jury, stated:  "In determining whether or not the 81 MM mortar shell was defective, you are instructed that the plaintiffs need not prove a specific defect."  Jury Instr. 25.

34

Pages 25 and 26 constituted the court's instruction--based on
Jenkins v. Whittaker Corp., 785 F.2d 720 (9th Cir. 1986), and
agreed to by the parties--regarding the doctrine of res ipsa
loquitur.  See Jury Instr. 25-26.

To the extent Plaintiffs seek to argue that they were
*entitled* to an inference of liability, that is not the law in
Hawaii.  Res ipsa loquitur "permits but does not compel" the jury
to find liability, "even in the absence of contrary evidence."
Jenkins, 785 F.2d at 733 (emphasis omitted); see also Stryker v.
Queen's Med. Ctr., 60 Haw. 214, 218, 587 P.2d 1229, 1232 (1978)
(holding that trial court properly refused to give a res ipsa
loquitur instruction that compelled rather than permitted a
finding of negligence).

Plaintiffs' cited authorities do not suggest otherwise.
In Stewart v. Budget Rent-a-Car Corp., 52 Haw. 71, 470 P.2d 240
(1970), the court determined only that "testimony of the user and
the fact of an accident is enough to send the case to the jury."
52 Haw. at 75-76, 470 P.2d at 243.  Similarly, in Wakabayashi v.
Hertz Corp., 66 Haw. 265, 660 P.2d 1309 (1983), the Hawaii
Supreme Court held that witnesses' testimony regarding the
behavior of a car during an accident, without additional evidence
that the car was damaged, was sufficient to allow for
"consideration by the jury" as to whether "there was a defective
condition which caused the accident."  66 Haw. at 271; 660 P.2d

at 1313.  Neither of these cases holds that the purpose of a <u>res</u>
<u>ipsa loquitur</u> instruction is to assure a finding in Plaintiffs'
favor.  Rather, the cases hold that the instruction simply
permits a jury to infer that the product at issue is defective,
if it chooses to do so.

The court's response to the third jury question
instructed the jury to render a finding of "no liability" if it
determined there was not enough evidence to prove the shell was
defective.  Plaintiffs cannot argue that they were not required
to prove the shell defective; this was Plaintiffs' fundamental
task in this case.  The court's response to the third jury
question referred the jury to instructions regarding the issues
of specific defect and <u>res ipsa loquitur</u>.  If, considering these
instructions and the others referenced by the court, the jury
could not conclude the shell was defective, the jury was required
to answer "no" to special verdict form question number 1.
Plaintiffs' objections are unwarranted.

VI.      <u>CONCLUSION.</u>

For the reasons above, the court DENIES Plaintiffs'
motion for judgment as a matter of law and for a new trial.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 25, 2011.



_/s/ Susan Oki Mollway_
Susan Oki Mollway
Chief United States District Judge

Rodriguez v. General Dynamics Armament and Technical Products, Inc.; Civil No. 08-00189 SOM/KSC; ORDER DENYING PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL

37